Ebun ADELONA, Nzinga Adelona, by her mother Ebun Adelona, Violet Hyman, Douglas Harris, Michelle Hodges, Douglas Toure Harris, by his father and mother Douglas Harris and Michelle Hodges, Wilbur Jackson, Carlton Thompkins, Christine Thompkins, William Shields, Lila R. Shields, Jean Werner, Fred Werner, Muriel Otley, Oswald Facey, and Caroline Facey, by her father Oswald Facey, Plaintiffs,

v.

William WEBSTER, Ronald Butkiewicz, and Approximately Fifty Unknown Agents and Officers of the Federal Bureau of Investigation, also known as Mary Ellen Beekman, Daniel J. Bertrand, Daniel B. Caylor, Robert J. Cordier, John W. Grouthamel, John W. Dalseg, Philip Grivas, Michael J. Henehan, James R. Lyons, Barry W. Mawn, Kenneth J. Maxwell, Robert D. Shea, Thomas J. Terjeson, Joseph Valiquette, Jr., Larry Wack, Donald J. Zembiec, David E. Carman, George Hanna, John F. Keenan, Alan V. MacDonald, Edmond J. Boran, Robert L. Paquette, John C. Cable, Thomas F. Lagatol, Phillip Hayden, Ralph J. Iannuzi, Robert J. Gleason, Daniel P. Blake, Ford W. Cole, Lynn J. Ferrin, Stephen A. Gilkerson, Thomas B. Locke, Jack L. Osborne, Don G. Provonsha, Danny A. Scott, Edwin J. Sharp, Joseph P. MacFarlane, Harold Suber, and the United States of America, Defendants.

No. 81 Civ. 0373 (SWK).

United States District Court,
S.D. New York.

Feb. 10, 1987.

New York Civil Liberties Union, C. Vernon Mason, New York City by Richard Emery, Jon Pines, for plaintiffs.

Rudolph W. Giuliani, U.S. Atty., for S.D. N.Y. by Carolyn Simpson, Asst. U.S. Atty., for U.S. of America and the individual Federal defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This is a *Bivens* action. Plaintiffs seek damages, in the amount of $92 million, from the individual defendants as well as from the United States of America, together with declaratory and injunctive relief for the injuries they allegedly sustained as a result of the FBI Agents' entry into and search of a Harlem apartment building during the early morning hours of April 19, 1980. The case is presently before this Court on the defendants' motion for summary judgment on and dismissal of the plaintiffs' claims against them.

## BACKGROUND

When the events underlying this motion occurred, plaintiffs[1] were tenants of 92 Morningside Avenue, an apartment building located in the Harlem area of Manhattan. Defendant William Webster was the director of the Federal Bureau of Investigation ("FBI"). Defendants Ronald Butkewiecz, Robert Cordier, Mary Ellen Beekman, John Grouthamel, Daniel Caylor, James Lyons, Kenneth Maxwell, Danny Scott, Thomas Terjeson, Joseph Valiquette and Larry Wack were FBI agents assigned to Manhattan Squad 10 ("M-10"). Defendants David Carman, John Cable, George Hanna, Phillip Hayden, Ralph Iannuzi, John Keenan, and Alan MacDonald were FBI agents assigned to the Brooklyn/Queens Metropolitan Resident Agency Special Weapons and Tactics Team ("BQ SWAT"). Defendants Stephen Gilkerson, Daniel Blake, Edmond Boran, Ford Cole, Robert Gleason, Jack Osborne and Robert Packet were FBI agents assigned to the New Rochelle Metropolitan Resident Agency ("NR SWAT"). Defendants Michael J. Henehan, Lynn Ferrin, Philip Grivas, Thomas Lagotol, Barry Mawn, Don Provonsha, Robert Shea and Donald Zembiec were FBI agents assigned to the Manhattan SWAT Team. Defendant Daniel Bertrand was serving as SWAT coordinator for the New York Division. Defendant Edwin Sharp was serving as Special Agent in Charge ("SAC") of the Brooklyn/Queens Metropolitan Resident Agency, New York Division. Defendant John Dalseg was serving as Assistant Special Agent in Charge (ASAC) of the Criminal Division of the Manhattan office, New York Division. Defendant Thomas Locke was serving as Supervisory Special Agent for Squad M-10. Defendant Joseph MacFarlane[2] was serving as SAC of the Administrative Division of the New York office. The final defendant in this action is The United States of America.

Defendants entered and searched 92 Morningside Avenue on the morning of April 19, 1980 as part of an ongoing and extensive FBI effort that began in November, 1979 to apprehend federal fugitive Joanne Chesimard. Chesimard, also known as Assata Shakur, allegedly a leader of the Black Liberation Army, escaped from the New Jersey State Prison in Clinton, New Jersey on November 3, 1979. Chesimard had been serving a life term for the murder of a New Jersey state trooper in 1973. At the time of the murder, Chesimard was also wanted for questioning in connection with several armed bank robberies in the New York area for which the Black Liberation Army had taken credit. In November, 1979, Magistrate Hunt of the District of New Jersey issued a federal arrest warrant for Chesimard pursuant to 18 U.S.C. § 1073.

Plaintiffs bring several claims against defendants arising from the entry and search. Plaintiffs bring their claims under the United States Constitution, federal statutes, and common law tort principles. Jurisdiction is invoked pursuant to 42 U.S.C. §§ 1983 and 1985, 28 U.S.C. §§ 1331(a), 1343 and 1361, and the United States Constitution for plaintiffs' claims of alleged violations of their constitutional rights, 28 U.S.C. §§ 1346(b) and 2671 et seq. for plaintiff's tort claims, 18 U.S.C. §§ 2511 and 2520, for plaintiffs' claims of illegal wiretaps, and principles of pendent jurisdiction for plaintiffs' common law tort claims.

1. The complaints of two plaintiffs originally in the action, Emily Brown and Craig Brown, were dismissed by court order dated April 25, 1982 (Conner, J.).

2. MacFarlane, originally a defendant in a separate action, *Adelona v. MacFarlane,* became a defendant in this case by court order dated March 31, 1982 (Conner, J.), amending the complaint and dismissing the separate action. In addition, the following original defendants were dismissed from this action by court order dated February 28, 1982 (Conner, J.): Robert McGuire, Frank Basile, The City of New York, and unknown agents and officers of the New York City Police Force. Harold Suber, the Superintendent of 92 Morningside Avenue, and a named defendant in this action, is not party to this motion. Suber filed an answer, *pro se,* on February 13, 1981 denying the allegations contained in the complaint.

*Plaintiffs' Allegations and Legal Claims*

Plaintiff Violet Hyman's apartment (apartment 32) was forceably entered and searched. Hyman claims that it was ransacked, and that an address book was taken from it by defendant Butkiewicz and other unknown defendants. Plaintiff Ebun Adelona's and her daughter Nzinga Adelona's—a minor who pursues this action through her mother—apartment (apartment 34) was forceably entered and searched by certain defendants. Ebun Adelona alleges that it was ransacked and that she and her daughter were assaulted by defendant Butkiewicz and other unknown defendants. Plaintiff Wilbur Jackson's apartment was entered. Jackson alleges that he was assaulted and that his apartment was searched by certain unknown defendants. Plaintiffs Douglas Harris', Michelle Hodges', and their son Douglas Toure Harris'—a minor who pursues this action through his father and mother—apartment (apartment 71) was entered and searched. These plaintiffs allege that Douglas Harris was assaulted by defendant Butkiewicz and several other unknown defendants and that Douglas Toure Harris was traumatized. Plaintiff Carlton Thompkins was present in the lobby when defendants entered the building. Thompkins alleges that he was assaulted by several unknown defendants. Plaintiffs Christine Thompkins and William Shields were out during the evening of April 18, 1980. They allege that they were forceably restrained from entering the apartment building for over three hours by several unknown defendants. Plaintiffs Lila R. Shields, Jean Werner, Muriel Otley, Oswald Facey and his daughter Caroline Facey—a minor who pursues this action through her father—were inside their apartments when the defendants entered the building. They allege that they were frightened and intimidated by the presence of unknown defendants in the building.

Based on these factual allegations, all plaintiffs allege that defendants conspired to and did deny them their constitutional rights under the First, Fourth, Fifth, Ninth and Fourteenth Amendments.

Hyman alleges that defendants committed the common law torts of invasion of privacy and intentional and negligent infliction of emotional distress, in violation of state law.

Ebun and Nzinga Adelona, Douglas and Toure Harris, Michelle Hodges and Wilbur Jackson allege that defendants placed illegal wiretaps on their phones in violation of 18 U.S.C. §§ 2511 and 2520.

Ebun and Nzinga Adelona, Douglas and Douglas Toure Harris, Michelle Hodges, Wilbur Jackson, and Carlton Thompkins allege that defendants committed the common law torts of assault, battery, false imprisonment, false arrest, intentional and negligent infliction of emotional distress and invasion of privacy in violation of state law.

Plaintiffs Christine Thompkins and William Shields allege that defendants committed the common law torts of false arrest, false imprisonment, intentional and negligent infliction of emotional distress and invasion of privacy, in violation of state law.

Plaintiffs Muriel Otley, Fred and Jean Werner, and Oswald and Caroline Facey allege that defendants committed the common law torts of invasion of privacy, disturbance of the quiet enjoyment of their residences, and intentional and negligent infliction of emotional distress, in violation of state law.

*Defendants' Motions*

This case is currently before the Court on the defendants' motions to dismiss plaintiffs' claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The individual defendants move to dismiss plaintiffs' common law tort claims. The individual defendants also move for summary judgment on plaintiffs' constitutional claims. Certain individual defendants move to dismiss the constitutional claims. The individual defendants move to dismiss or for summary judgment on plaintiff's conspiracy claims. The individual defendants move for summary judg-

ment on plaintiffs' claims of illegal wiretap and surveillance. Defendant William Webster moves to dismiss the complaint as against him. Defendant United States of America moves to dismiss the complaint as against it.

## SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". Fed.R. Civ.P. 56(c). The Court's role is to determine whether there are issues to be tried. *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In testing whether the movant has met this burden, the Court must resolve all ambiguities against the movant. *Heyman, supra,* 524 F.2d at 1320. The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* — U.S. —, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The nonmoving party has the burden of coming forward with "specific facts showing that there is a genuine issue for trial". Fed.R.Civ.P. 56(e). The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts". *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* — U.S. —, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact.

## PERSONAL JURISDICTION OVER WILLIAM WEBSTER

■ Defendant William Webster moves to dismiss plaintiffs' claims against him on the ground that this Court lacks personal jurisdiction over him. Webster has never resided in New York, and he also was not served in New York.[3] This Court must look to New York state law to determine whether Webster can be subjected to its jurisdiction. *Marsh v. Kitchen,* 480 F.2d 1270, 1272 n. 6 (2d Cir.1973) (federal court must "look to state law to determine what manner and under what circumstances a party not present in the forum state can be subjected to the jurisdiction of a federal district court"). Personal jurisdiction over Webster must thus be assessed under New York's long arm statute which provides

*"Acts which are the basis of jurisdiction.* As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

(1) transacts any business within the state or contracts anywhere to supply goods or services in the state: or

(2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or

(3) commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

---

**3.** Defendant Webster also contends that he was improperly served, in violation of Federal Rule of Civil Procedure 4(d)(1) in effect at the time service was made. Because the Court finds that it lacks personal jurisdiction over Webster for the reasons stated below, it will not address this issue at this time.

(4) owns, uses or possesses any real property situated within the state."

N.Y.Civ.Prac.Law § 302(a) (McKinney 1972 & Supp.1987).

Plaintiffs bear the burden of proving that Webster falls within the statute's embrace. *E.g. Lehigh Valley Industries, Inc. v. Birenbaum,* 527 F.2d 87, 92 (2d Cir. 1975); *Louis Marx & Co. v. Fuji Seiko Co., Ltd.,* 453 F.Supp. 385, 389 (S.D.N.Y. 1978).

The parties do not dispute that Webster was not present at the scene of the raid. In addition, Webster has submitted an affidavit disassociating himself from the decision making process in this case. Plaintiffs allege that Webster's policies as director of the FBI contributed to the occurrence of the raid. Plaintiffs, however, have presented no evidence in support of this allegation. Defendant Webster has, on the other hand, presented evidence showing that the FBI rules set out the required constitutional standards for searches.

In addition, jurisdiction over Webster may not be asserted on the basis of agency because plaintiffs have not shown that the individual defendants who allegedly did commit tortious acts within the state were acting as Webster's "personal agents". *Grove Press, Inc. v. Angleton,* 649 F.2d 121, 123 (2d Cir.1981) (Second Circuit rejected district court's assertion of jurisdiction over three nonresident employees of the Central Intelligence Agency ("CIA"), including its then Director, where jurisdiction had been asserted on the theory that unnamed CIA agents had committed tortious acts in New York pursuant to § 302(a)(2) as agents for the nonresident CIA employees).

Accordingly, Webster's motion to dismiss plaintiffs' claims against him is GRANTED because this Court lacks personal jurisdiction over him.

## THE CONSTITUTIONAL CLAIMS

Defendants assert that they are entitled to summary judgment on plaintiffs' constitutional claims because they have qualified immunity from the claims, or alternatively because their actions were at all times constitutional.

### Qualified Immunity

■ Government officials performing discretionary functions are immune from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In order to determine whether defendants in this case are entitled to qualified immunity, this Court must first determine whether the constitutional rights alleged to have been violated were well established at the time; it then must determine whether the defendants reasonably should have known of their existence. *Hobson v. Wilson,* 737 F.2d 1, 26 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985).

Plaintiffs' claims result from defendants' entry into and search of 92 Morningside Avenue pursuant to an arrest warrant for federal fugitive Joanne Chesimard. This Court's inquiry must focus on whether the constitutional rights plaintiffs claim were violated were well established when they took place—April 18–19, 1980.

### The Constitutional Standards

#### Fourth Amendment Rights [4]

Prior to April, 1980, the Circuits agreed that an arrest warrant alone was not constitutionally sufficient to justify the entry into a third party's dwelling in search of the subject of that warrant. Something more was needed; the most lenient of Circuit courts required only that the government officials holding the arrest warrant

---

**4.** Plaintiffs have asserted the First, Fifth, Ninth and Fourteenth Amendments as bases for their claims as well. It appears that plaintiffs intended to invoke a constitutional right to privacy, such as that described by the United States Supreme Court in *Griswold v. State of Connecti-* *cut,* 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). According to plaintiffs' brief the substance of their privacy argument is based in the Fourth Amendment, and the Court addresses the Fourth Amendment only.

also have a reasonable belief that the person named in the warrant is located on the premises.[5] *United States v. Brown,* 467 F.2d 419, 423 (D.C.Cir.1972). One Circuit required exigent circumstances in addition to the arrest warrant. *United States v. Cravero,* 545 F.2d 406, 415 (5th Cir.1976). Another Circuit required both that the entering officers have probable cause to believe that the subject of the warrant is present, and exigent circumstances. *Government of the Virgin Islands v. Gereau,* 502 F.2d 914, 928 (3d Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 421 L.Ed.2d 839 (1975).

Also prior to April, 1980, the United States Supreme Court determined that the constitutionality of the scope of a particular search would be based on the level of intrusion that was involved, the manner in which it was conducted, the place in which it was conducted, the justification for initiating it, as balanced against the need for the particular search. *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

The defendants reasonably knew or should have known of the existence of these standards. Defendants were all law enforcement officials, who were or should have been trained in the rules governing arrest and search procedures. The FBI's handbook for procedures regarding entries and searches absent search warrants requires probable cause. Federal Bureau of Investigation Regulations, §§ 3–7 (Plaintiff's Exhibit). As such, defendants were on notice that the law required at least

some measure of belief on their part that Ms. Chesimard was located on the premises. Defendants were similarly on notice, or should have been on notice, that the factors listed above weighed in determining the legality of the search procedures.

*The Entry*

■ Based on the most lenient standard, the key to the legality of the entry itself is whether defendants had a reasonable belief that Chesimard was located at 92 Morningside Avenue. It is clear that the FBI's decision to enter the building was based on information it received from an informant. There are, however, material issues as to the reliability of that informant and the content of the information he gave to the FBI. This in turn creates an issue of fact regarding reasonable belief, rendering summary judgment inappropriate.

Defendants had certain information about the reliability of the informant before relying on the information received from him to enter the building. Defendants knew that the informant was a previously convicted felon with a long rap sheet and a history as an informant, and also that he was dismissed by the Newark FBI office because of unreliability just prior to his involvement in this case. Defendants also knew, however, that the informant passed a polygraph test as to certain statements he made to them regarding the Chesimard search. In addition, defendants assert that the informant was carefully monitored for truthfulness in this case (Cordier aff. at p. 3).[6]

---

**5.** This standard may be applicable to this entry only because of the date it occurred. It is clear that entry into a third party's dwelling in search of the subject of an arrest warrant without a search warrant is now prohibited absent "exigent circumstances". *United States v. Steagald,* 451 U.S. 204 (1981).

**6.** Additional information regarding the reliability of the informant became available only after defendants made the decision to enter the building. For example, plaintiffs' deposition of the informant reveals the informant's propensity to forget significant events. (Informant Dep. at 152, 194, 214). In addition, although the informant gathered information for the case through a relationship with Beatrice Watson, otherwise

known as Bibi Angola, a one time close friend of Ms. Chesimard, plaintiffs' deposition of the informant, and defendants' deposition of Watson, are blatantly contradictory. Most significantly, Watson stated that she had no contact with Chesimard during her relationship with the informant. Watson claims that the party she attended at 92 Morningside Avenue on the evening of April 18, 1980 was for plaintiff Ebun Adelona and that she had not indicated to the informant that Chesimard would be present. The informant stated that Watson had been in touch with Chesimard several times during their relationship and that Watson had specifically indicated to him that Chesimard would be present at the party.

In addition, there is a genuine issue of fact as to whether the informant ever actually indicated to the FBI that Chesimard was in the building at the time they entered it. In making the final decision to enter, defendants relied heavily on a short, three question telephone conversation with the informant. Defendants' statements regarding the substance of this conversation, however, differ. For example, according to one defendant (MacFarlane), the informant was asked: "Is Chesimard in the apartment? Is she going to stay all night? Are you positive Chesimard is in the apartment?", and the informant answered yes to all three questions. According to another defendant (Cordier), the informant was asked those questions and responded "Yes", "I don't know", and "yes" to them in that order.

Also prior to entering, defendant Cordier ordered the informant to give a signal—to step out of his car and open and close its trunk—if and when he was told directly by Watson that Chesimard was in the building. The record does not indicate that this signal was given.

### The Search

There is a conflict between the sworn statements of plaintiffs and the defendants regarding the scope of the search which only can be resolved at trial. Defendants' affidavits state that the search was conducted in an orderly, nonintrusive fashion and that the searching agents' conduct towards the residents of 92 Morningside Avenue was at all times respectful and clearly within the legal boundaries of a search under the circumstances. Plaintiffs' affidavits state that the agents' conduct was abusive and unduly intrusive under the circumstances.

Whether the defendants violated plaintiffs' established legal rights when they entered and searched the apartment building is a disputed issue in this case. Defendants' motion for summary judgment on plaintiffs' constitutional claims because of qualified immunity is thus DENIED on the authority of *Harlow*.

### Constitutionality of Defendants' Actions

Defendants assert as a separate ground for summary judgment on plaintiffs' constitutional claims that their actions were at all times constitutional. As stated immediately above, this Court must resolve at trial disputed facts regarding the constitutionality of defendants' actions in this case.

Accordingly, defendants' motion for summary judgment on the constitutional claims against them because the actions were at all times constitutional is DENIED.

### CONSTITUTIONAL CLAIMS AGAINST INDIVIDUAL DEFENDANTS ALLEGEDLY NOT INVOLVED IN THE ACTS ALLEGED IN THE COMPLAINT

Plaintiffs are seeking damages from each of the individual defendants in their personal capacities for the alleged constitutional violations based upon an implied right of action for constitutional violations under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

 Liability in a *Bivens* case may not be based upon the doctrine of *respondeat superior* and may not be imposed unless the defendant was personally responsible for the constitutional violation. *Black v. United States*, 534 F.2d 524, 527–28 (2d Cir.1976).

Defendants, accordingly, assert that plaintiffs' constitutional claims against the following defendants should be dismissed because they had no personal involvement with the constitutional violations alleged by plaintiffs: the members of the BQ SWAT team (FBI Agents Carman, Cable, Hanna, Hayden, Iannuzzi, Keenan, and MacDonald), the members of Squad M–10 (FBI Agents Cordier, Beekman, Butkiewicz, Caylor, Crouthamel, Lyons, Maxwell, Scott, Terjeson, Valiquette and Wack), the members of the NR SWAT Team (FBI Agents Gilkerson, Boran, Blake, Cole, Gleason, Osborne and Paquette), the members of the Manhattan SWAT Team (FBI Agents Henehan, Ferrin, Grivas, Lagatol, Mawn, Shea and Zembiec), and FBI Management per-

sonnel including MacFarlane, Sharp, Dalseg, Bertrand (except as to the claims of plaintiffs Adelona and Hyman against him), and Locke (except as to the claims of Carlton Thompkins and William Shields against him).[7]

The personal involvement of each individual defendant in the raid is a disputed issue in this case. Each of the individual defendants submitted an affidavit as to his or her involvement. No defendant, with the exception of William Webster, denies having been present at the scene of the raid. Defendants, Carman, Cable, Hanna, Hayden, Iannuzzi, Keenan, and MacDonald, all members of the BQ Swat team, state that they were assigned to cover the roof of 92 Morningside Avenue. Defendants Keenan, MacDonald, and Hanna, also members of the BQ Swat team, state that they were assigned to cover the alleyway behind the building. Defendants Beekman, Terjeson, and Caylor, all members of Squad M–10 state that they were located immediately outside the building on surveillance or perimeter security. Defendant Valiquette, a member of Squad M–10, states that he was located outside the building and in the lobby and on the first floor. Defendants Scott and Grouthamel, both members of Squad M–10, state that they were located in the first floor lobby area of the apartment building. Defendant Lyons, another member of Squad M–10, states that he was located in the lobby area of the building and briefly entered apartment 34. Defendant Maxwell, a member of Squad M–10, states that he was located on surveillance outside the building, on the second floor, and also entered apartment 34 on the third floor. Defendant Butkiewicz states that he was located on the first floor, and that he also went up to apartment 34. Defendant Wack states that he was located outside the building on the first floor, and that he entered apartment 34. Defendant Cordier was the Squad M–10 case agent in charge of the Chesimard investigation. Cordier states that during the raid he was located on the second floor, that he entered apartment 34, and was also located on the seventh floor. Defendant Gilkerson, a member of NR Swat, states that he was located on the third floor, and that he entered both apartments 32 and 34. Defendant Blake, a member of NR Swat, states that he was located on the third floor. Defendant Boran, a member of NR Swat, states that he was located on the third floor and that he entered apartments 31, 32, and 34. Defendant Cole, of NR Swat, states that he entered apartments 32 and 34. Defendant Gleason, of NR Swat, states that he was located on the third floor. Defendant Osborne, an NR Swat member, states that he was located on the third floor. Defendant Paquette, an NR Swat member, states that he entered apartments 32 and 34. Defendants Henehan, Lagatol, Provonsha, and Shea, all members of Manhattan Swat, state that they entered apartment 32. Defendants Henehan, Lagatol, Grivas, and Shea state that they also entered Apartment 71. All of the members of the Manhattan Swat team state that they entered apartment 34. Defendant Joseph MacFarlane was the highest ranking FBI agent at the scene of the raid. He states that he made the decision to enter the building and apartments 32 and 34, and to interview the residents of apartment 71. Defendant Sharp states that he was located on the first and third floors. Defendant Dalseg states that during the raid he was positioned on the landing between the first and second floors, and also at the front of the building. Defendant Bertrand was the coordinator of the Manhattan, BQ, and NR Swat teams, and states that he was involved in planning the raid. He states that he was located at the stairs, that he entered apartment 34, and that he was also located on the seventh floor during the raid. Bertrand also states that he instructed the agents to enter apartments 32 and 34 and to interview other residents of the building. Defendant Locke states that he

7. Defendant Webster originally joined in this assertion, but because the Court has already dismissed plaintiffs' claims as against him for lack of personal jurisdiction, it will not address his assertion here.

entered the lobby of the building and was also located immediately outside the building.

■ Plaintiffs' complaint contains specific allegations as to the nature and extent of the alleged violations, but does not designate a specific violation to a specific defendant. With the exception of defendant Butkiewicz, plaintiffs' complaint refers only to "unknown defendants". Plaintiffs' designation of defendants as unknown is entirely appropriate. *Bivens,* 403 U.S. at 389, 91 S.Ct. at 2001; *Spock v. United States,* 464 F.Supp. 510, 518 (S.D.N.Y. 1978); *Williams v. Brennan, Lewisohn, Schaeffer, Senior Corrections Officers A through D, and Corrections Officers E through J,* No. 80–5870 (S.D.N.Y. May 14, 1981) (available January 29, 1987, on LEXIS, Genfed Library, Dist. file) [Available on WESTLAW, DCTU database]. Plaintiffs could not, in their complaint, have been expected to identify the names of the various agents who performed specific tasks during the raid. *Cf. Intersimone v. Bell,* No. 79–4382 (S.D.N.Y. July 10, 1980) (available January 29, 1987, on LEXIS, Genfed Library, Dist. file); *Moore v. Civiletti, et al.,* No. 80–5332 (S.D.N.Y. October 23, 1981) (available January 29, 1987 on LEXIS, Genfed Library Dist. file) [Available on WESTLAW, DCTU database]. Moreover, because plaintiffs have not yet been granted leave to depose the individual defendants [8] the Court has only defendants' statements as to which defendants participated in each phase of the raid. Plaintiffs have, however, provided sworn testimony that violations by various agents involved in the raid did take place.

Accordingly, defendants' motion to dismiss plaintiffs' constitutional claims on the grounds that the individual defendants were not personally involved in the events is DENIED. This decision is without prejudice to defendants' rights to renew, if appropriate, upon completion of discovery.

**COMMON LAW TORT CLAIMS**

Defendants assert that summary judgment should be granted in their favor on plaintiffs' common law tort claims because the defendants are absolutely immune from these claims.

*Absolute Immunity*

■ Federal officials are absolutely immune from all claims arising out of tortious acts which do not amount to constitutional violations if those acts were committed within the scope of their official duty and required the exercise of discretion. *Barr v. Matteo,* 360 U.S. 564, 572–74, 79 S.Ct. 1335, 1340–41, 3 L.Ed.2d 1434 (1959); *Huntington Towers Ltd. v. Franklin National Bank,* 559 F.2d 863, 870–87 (2d Cir. 1977); *Wyler v. United States,* 725 F.2d 156, 159 (2d Cir.1983).

■ Defendants meet this absolute immunity test. Defendants were acting within the scope of their duties as FBI agents when they entered and searched 92 Morningside Avenue. This Court has lent broad definition to the term "within the scope of official duty" for absolute immunity purposes, stating: " 'Within the scope' is a term of art; it signifies merely that the accused's conduct is, on its face (that is, viewed apart from the underlying motivation of the actor), the sort that the official is empowered to perform." *Fairchild, Arabatzis & Smith, Inc. v. Sackheim,* 451 F.Supp. 1181, 1194 n. 7 (S.D.N.Y.1978). Under this standard, defendants' search for federal fugitive Joanne Chesimard falls well within the rubric of duties generally performed by FBI agents.

Defendants' actions also involved the "exercise of discretion". The decision whether or not to enter a premises to conduct a search and also how to conduct a search clearly involves judgment and discretion at each phase. Each FBI agent involved in this case was required to exercise judgment related to these decisions.

Defendants are thus absolutely immune from liability for the torts they allegedly

8. Plaintiffs were denied the opportunity to depose the individual defendants by court order dated October 4, 1983 (Tyler, M.) pursuant to *Harlow,* pending disposition of this motion.

committed at 92 Morningside Avenue, to the extent that they are pleaded as common law torts and not constitutional violations. Defendants' motion for summary judgment on plaintiffs' common law tort claims is thus GRANTED.

CONSPIRACY CLAIMS

Plaintifs assert that the individual defendants conspired to deny them of their constitutional rights. Plaintiffs' complaint asserts no factual basis for the conspiracy it charges. Plaintiffs state simply that "on information and belief" the individual defendants conspired with the telephone company with regard to the alleged wiretapping and with defendant Suber, who is not a party to this motion, to execute the raid. No isolated acts of conspiracy beyond these two sweeping allegations are specified. In addition, plaintiffs have produced no evidence in support of their conspiracy claims.

■ Specificity in pleading is required where conspiracy to deprive constitutional rights is charged. *See e.g., Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *423 South Salina Street Inc. v. Syracuse,* 724 F.2d 26, 27 (2d Cir.1983). Where complaints alleging a conspiracy of large dimension, such as this one, have included "conclusory", "vague" or "general allegations", this Circuit has repeatedly dismissed them. *See Ostrer, supra,* 567 F.2d at 553 (citations therein). Where plaintiffs do not produce evidence in support of their allegations in the face of defendants' denials, summary judgment is appropriate. *Contemporary Mission, Inc. v. United States Postal Service,* 648 F.2d 97, 107 (2d Cir.1981).

Plaintiffs' conspiracy claims are thus DISMISSED without prejudice to renew. Defendants' motion for summary judgment on the conspiracy claims is thus GRANTED.

ILLEGAL WIRETAP AND SURVEILLANCE CLAIMS

*Wiretap Claims*

■ Plaintiffs allege that the individual defendants caused illegal wiretaps to be placed on several plaintiffs' telephones be-

fore April 18, 1980 and that such wiretaps have remained after April 18, 1980 in violation of 18 U.S.C. §§ 2511 and 2520. Defendants move for summary judgment on these claims.

Where plaintiffs produce "nothing more than a recital of unsupported allegations, conclusory in nature" that defendants intercepted, disclosed, or used any wiretapped communications, summary judgment should be granted. *Broadway v. Montgomery,* 530 F.2d 657, 660 (5th Cir. 1976).

Plaintiffs have not alleged any facts regarding the alleged wiretapping in their complaint, nor have they produced any evidence regarding wiretapping through discovery to this date.

Summary judgment on plaintiffs' wiretap claims is thus GRANTED without prejudice to plaintiffs' right to renew upon a sufficient factual showing.

*Surveillance Claims*

■ Plaintiffs allege that defendants engaged in surveillance of plaintiffs, that such surveillance was and continues to be oppressive and harmful, and that there was and is no valid basis to surveil plaintiffs. Defendants move for summary judgment on these claims. Because not all surveillance activities are per se unconstitutional, plaintiffs are required to allege sufficient facts to show that a particular surveillance was unconstitutional. *Glaros v. Perse,* 628 F.2d 679, 684 (1st Cir.1980); *Reporters Committee for Freedom of Press v. American Telephone & Telegraph,* 593 F.2d 1030, 1064 (D.C.Cir.1978), *cert. denied,* 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979).

Plaintiffs have not alleged, nor does the evidence presently in the record show that defendants engaged in surveillance of 92 Morningside Avenue or any of the individual plaintiffs at any time other than the hours during and immediately surrounding the raid.

Summary judgment on plaintiffs' claims of illegal surveillance is thus GRANTED

without prejudice to plaintiffs' right to renew upon a sufficient factual showing.

CLAIMS AGAINST THE UNITED STATES

 Defendant United States moves to dismiss plaintiffs' constitutional claims against it on the grounds of sovereign immunity.[9]

A party seeking damages against the United States must show an explicit waiver of sovereign immunity for such a lawsuit. *United States v. Testan,* 424 U.S. 392, 399–401, 96 S.Ct. 948, 953–955, 47 L.Ed.2d 114 (1976); *United States v. Mitchell,* 463 U.S. 206, 217–218, 103 S.Ct. 2961, 2968–2969, 77 L.Ed.2d 580 (1983). While the United States has waived its sovereign immunity for certain common law torts under the circumstances specified in the Federal Tort Claims Act (28 U.S.C. §§ 1346 and 2671, *et seq.*), it has not waived its immunity for constitutional torts. *Contemporary Mission, Inc., supra,* at 104–105, n. 9.

Defendant United States' motion to dismiss plaintiffs' claims against it is thus GRANTED on the grounds of sovereign immunity.

### CONCLUSION

Defendant Webster's motion to dismiss plaintiffs' claims against him is granted. The remaining defendants' motion for summary judgment on plaintiffs' common law tort claims is granted. Defendants' motion for summary judgment on plaintiffs' constitutional claims is denied. Defendants' motion to dismiss plaintiffs' constitutional claims against certain individual defendants allegedly not involved in the acts alleged in the complaint is denied, without prejudice. Defendants' motion to dismiss plaintiffs' conspiracy claims is granted, without prejudice. Defendants' motion for summary judgment on plaintiffs' conspiracy claims is granted. Defendants' motion for summary judgment on plaintiffs' illegal wiretap and surveillance claims is granted, without prejudice. Defendant United States of America's motion to dismiss plaintiffs' constitutional claims against it is granted because of sovereign immunity.

SO ORDERED.

9. Defendant United States of America has not moved with regard to plaintiffs' common law tort claims against it, which are brought pursuant to the Federal Tort Claims Act. 28 U.S.C. §§ 1346(b) and 2671, *et seq.*